AMY J. LONGO (Cal. Bar No. 198304)
Email: Longoa@sec.gov
CHRISTOPHER A. NOWLIN (Cal. Bar No. 268030)
Email: Nowlinc@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Alka N. Patel, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Securities and Exchange Commission,<br><br>Plaintiff,<br><br>vs.<br><br>David A. Harbour,<br><br>Defendant. | Case No.<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2. Defendant has, directly or indirectly, made use of the means or instrumentalities of interstate commerce or of the mails in connection with the

transactions, acts, practices and courses of business alleged in this complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a) because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.  In addition, venue is proper in this district because Defendant David Harbour resides in this district.

## SUMMARY

4. This matter is based on misrepresentations by Defendant David A. Harbour ("Harbour") concerning the use of investor funds in connection with his fundraising activities.  Between July 2014 and August 2016, Harbour, through various entities he managed and controlled, raised money from his friends and business acquaintances by representing to them that their funds would be used to finance various businesses, including an American Indian business entity engaged in high-interest installment lending to consumers.  Instead of directing the money to revenue-generating businesses that could achieve the high returns he promised, Harbour used substantial portions of the invested funds to finance his personal lifestyle and pay off his personal debts.  Harbour ultimately used $1,535,000 of the $2,450,000 that he raised from four investors to pay his personal expenses and pay off his debts.

5. By engaging in this conduct, Harbour violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5(b) promulgated thereunder and Section 17(a)(2) of the Securities Act of 1933 ("Securities Act").

## THE DEFENDANT

6. **Defendant David A. Harbour** is a resident of Scottsdale, Arizona. Harbour previously held FINRA Series 7 and 63 qualifications and was last associated with a broker-dealer in January 2008.

## OTHER RELEVANT ENTITIES

7. **Tribal Lending Entity A** was an online consumer lending enterprise that was a duly-organized subsidiary of an American Indian tribe.  Tribal Lending Entity A

COMPLAINT                                              2

has not registered any offerings or securities under the Securities Act, nor has it registered a class of any securities under the Exchange Act.

8. **Oak Tree Management LLC ("Oak Tree")** is a Wyoming limited liability company that was formed on December 10, 2013 and managed by Harbour and that has been dissolved by the Secretary of State of Wyoming. Oak Tree has not registered any offerings or securities under the Securities Act, nor has it registered a class of any securities under the Exchange Act.

9. **Pujanza Management, LLC ("Pujanza")** is a Wyoming limited liability company that was formed on July 1, 2014 and managed by Harbour and that has been dissolved by the Secretary of State of Wyoming. Pujanza has not registered any offerings or securities under the Securities Act, nor has it registered a class of any securities under the Exchange Act.

10. **Milagro Consulting, LLC ("Milagro")** is a Wyoming limited liability company that was formed on January 2, 2014 and managed by Harbour and that has been dissolved by the Secretary of State of Wyoming. Milagro has not registered any offerings or securities under the Securities Act, nor has it registered a class of any securities under the Exchange Act.

11. **Highpointe Capital Group, LLC ("Highpointe")** is an Arizona limited liability company that was formed on April 10, 2007 and managed by Harbour. Highpointe has no known assets. Highpointe has not registered any offerings or securities under the Securities Act, nor has it registered a class of any securities under the Exchange Act.

## STATEMENT OF FACTS

**A.    Harbour's Relevant Business Activities**

   **1.    Tribal Lending Entity A**

12. In 2014, Harbour, who had long been involved in the "payday loan" industry, began working with others to develop Tribal Lending Entity A.

13. In August 2014, Harbour, on behalf of his company, Oak Tree, entered into

COMPLAINT                                3

a loan agreement with Tribal Lending Entity A.  The agreement specified that Oak Tree would extend up to $10 million in credit to Tribal Lending Entity A at an annual interest rate not to exceed 16% so that Tribal Lending Entity A could "implement, operate and maintain its online consumer lending businesses currently in development."  Harbour signed the loan agreement as Oak Tree's "Manager."  Between August 2014 and October 2015, Oak Tree provided approximately $2.9 million in capital to Tribal Lending Entity A.

14.  From its inception in 2014 until late 2016, Harbour was actively involved in Tribal Lending Entity A's business.  In late 2016, a third party creditor of Tribal Lending Entity A took over the entity's operations.

### 2.   Other Harbour Ventures

15.  Between July 2014 and August 2016, Harbour was engaged in other business ventures, including a merchant cash advance business, as well as businesses associated with the same American Indian tribe that related to healthcare and fire-fighting.  Harbour described some of these ventures when seeking to raise money from the four investors.

### B.   Harbour's Misrepresentations Regarding Use of Investor Funds

16.  Harbour sought to raise money from investors to finance these enterprises, and particularly Tribal Lending Entity A.  Between July 2014 and August 2016, Harbour, through four entities he created and controlled, raised money from four individual investors, telling them their investments would be used to finance Tribal Lending Entity A or other revenue-generating businesses, and promising substantial returns.  Instead of using the invested money as represented, Harbour used $1,535,000 of the $2,450,000 raised from these four investors to finance his personal lifestyle and pay off his debts.

### 1.   Investor A

17.  In July 2014, Harbour, through Oak Tree, raised $500,000 from a limited liability company controlled by Investor A, a resident of Illinois.  Harbour orally represented to Investor A that the $500,000 would be used solely to finance a consumer

installment lending operation to be run by an American Indian tribal entity.

18. Harbour signed the promissory note for $500,000 that Oak Tree issued to Investor A's LLC and that included 12% annual interest.

19. Harbour was a signatory on the Oak Tree bank account to which Investor A transferred the $500,000 and had control over the money in that account and transfers or withdrawals from the account.

20. Contrary to Harbour's representations, much of the money invested by Investor A never went to Tribal Lending Entity A or any consumer lending business but instead was used by Harbour to pay his personal living expenses and debts. For example, days after receiving the $500,000, Harbour wired $35,000 to pay an individual who had loaned him money. Harbour also spent $144,000 to pay his credit card bills. The credit card charges included tens of thousands of dollars of Harbour's personal expenses such as private jets, Disney cruise trips, a visit to Universal Studios, golf tournament tickets, and a roughly $2,300 restaurant bill. Altogether, Harbour used $310,000 of the $500,000 provided by Investor A in ways that were inconsistent with his representations to Investor A.

**2.    Investor B**

21. In December 2014, Harbour, through his Pujanza entity, raised $1 million from Investor B, a resident of California. Harbour told Investor B that his $1 million investment would be pooled with other investor funds to finance various businesses connected to Harbour, including a consumer lending operation and a project related to healthcare. Harbour also promised Investor B that through these investments Investor B would achieve a 20% annual return. Based on these representations from Harbour, Investor B understood that his money would be invested in revenue-generating businesses, including a consumer lending operation, that would get him the promised high return.

22. Investor B's investment was structured such that he received a 1% membership interest in Pujanza, with Harbour, the "managing member" of Pujanza,

retaining a 99% membership interest. The "First Amended and Restated Operating Agreement for Pujanza Management, LLC," the only written agreement related to Investor B's investment, indicated that "[t]he Company is formed for the purpose of making investments in the form of equity investments or debt investments in various industries."

23. Investor B played no role in running Pujanza's business operations and was relying solely on Harbour's efforts to achieve profits.

24. As a signatory on the Pujanza bank account, Harbour exercised control over money in that account including Investor B's $1 million investment.

25. Contrary to his representations to Investor B, Harbour used $650,000 of the $1 million invested by Investor B to finance his personal lifestyle. For example, within two days of receiving the $1 million from Investor B, Harbour spent $223,000 to pay his credit card bills. The personal credit card charges related to, among other things, private jets, a Disney cruise vacation, concert tickets, a week-long stay at the Four Seasons Hotel in Orlando, Florida, and daily living expenses for Harbour and his family. Harbour also used Investor B's money to pay over $12,000 to a country club and to repay $36,000 to an investor from a prior business venture.

### 3. Investor C

26. In October 2015, Harbour, through his Oak Tree and Milagro entities, raised $500,000 from Investor C, a resident of Texas. Harbour orally told Investor C that the $500,000 investment would be used to finance Tribal Lending Entity A's lending operations and that the returns on the investment would allow Investor C to recover money he had lost in a previous investment to which Harbour was connected. Harbour sent Investor C marketing presentations for Tribal Lending Entity A and other information about its business, including an opinion letter from a law firm attesting to the legality of Tribal Lending Entity A's lending operations.

27. Investor C's investment was structured as a promissory note that also included a loan agreement. The promissory note executed by Oak Tree and Milagro (and

signed by Harbour) stated next to "Use of Proceeds" that "BORROWER [Oak Tree] shall use proceeds under this Note solely for the purpose of lending money to [the American Indian tribe that formed Tribal Lending Entity A]." The loan agreement similarly stated that the purpose of the loan was for Oak Tree and Milagro "to implement, operate and maintain [their] commercial lending business to [Tribal Lending Entity A]." The promissory note issued by Oak Tree and Milagro to Investor C provided for an annual return of 15%. Harbour also personally guaranteed Investor C's $500,000 investment.

28. Investor C was relying solely on the efforts of Harbour to achieve a return on his investment and played no role in the operations of Oak Tree, Milagro, or Tribal Lending Entity A.

29. Harbour was a signatory on the Oak Tree bank account to which Investor C transferred his $500,000 and had control over the money in that account and transfers or withdrawals from the account.

30. Contrary to his representations to Investor C, Harbour used $275,000 of Investor C's $500,000 investment on personal expenses that had no connection to Tribal Lending Entity A or any revenue-generating businesses. Harbour used investor funds to pay off substantial personal credit card statements, this time spending about $70,000 of Investor C's money to pay off a single monthly statement that included charges for personal expenses including restaurant meals, groceries, clothing, private jets, stays at resorts, and significant payments to a university's sports program. Harbour additionally sent roughly $90,000 to the account of an entity associated with one of his family members. He also used the funds to pay for golf clubs, life insurance premiums, car payments, and to make a small interest payment to Investor B.

### 4. Investor D

31. Between August 2015 and August 2016, Harbour, through the Highpointe entity, raised $450,000 from Investor D, a resident of Arizona. Harbour orally presented Investor D with various business ideas and promised that his investment would be pooled with other investor proceeds to be put into revenue-generating businesses, including

lending and healthcare related projects.  Harbour also sent Investor D a presentation describing Tribal Lending Entity A's business and encouraged Investor D to reach out to Tribal Lending Entity A's lawyers to discuss the business.

32. Highpointe issued six promissory notes to Investor D that Harbour signed on behalf of Highpointe.  The promissory notes specified an annual interest rate of 15% with the potential for an additional 5% per year at Harbour's discretion.  The notes further stated that the money being exchanged constituted a "business loan."

33. Investor D was to play no role in any of these businesses and was relying on Harbour's efforts to achieve a profit so as to be able to pay back Investor D.

34. Harbour was a signatory on the Highpointe bank account to which Investor D transferred his investment funds and had control over the money in that account and transfers or withdrawals from the account.

35. Contrary to his representations to Investor D, Harbour used at least $300,000 of Investor D's $450,000 investment for personal purposes, including paying off personal debts.  Harbour spent over $80,000 of Investor D's funds to pay off credit card charges.  These charges included thousands of dollars in purchases at Neiman Marcus, over $17,000 in payments to a residential architecture firm, thousands of dollars on expenses related to a golf tournament, and payments to a Beverly Hills plastic surgeon, as well as meals at restaurants, groceries, and purchases from Costco, Target, and Amazon.  Harbour additionally used Investor D's money to take out a cashier's check for $101,000 that appears unrelated to any business activity.  Harbour also used $50,000 to pay an individual who had invested with him in the past.

36. Harbour's misrepresentations were material, as the four investors would have considered it important to their investment decisions to know how Harbour was using their funds, as that could directly impact their ability to receive back their principal investments and achieve the high returns that Harbour promised.

37. Harbour acted with scienter.  He knew, or was reckless in not knowing, that the representations he made regarding the use of investor funds were false or misleading.

COMPLAINT                                                    8

38. In addition, Harbour failed to exercise reasonable care by making materially false and misleading representations about how the investors' money would be used.

39. During all relevant times, Harbour made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged in this complaint.

## FIRST CLAIM FOR RELIEF

**Fraud in Connection with the Purchase and Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b)**

**(Against Harbour)**

40. The SEC realleges and incorporates by reference paragraphs 1 through 39 above.

41. Harbour made false and misleading statements to the investors. He represented that their money would be used either to specifically finance Tribal Lending Entity A's operations or more generally to finance other Harbour business ventures. Despite these representations, Harbour spent over $1.5 million of the invested funds for personal expenses and to pay off his personal debts. These misrepresentations concerning use of funds were material to the investors.

42. Harbour acted with scienter. He knew, or was reckless in not knowing, that his statements regarding the use of investor funds were false and misleading. Harbour orally made the statements to the four investors, and he signed on behalf of his entities the agreements and documents evidencing the terms of the investments. Harbour controlled the bank accounts from which he misappropriated the investor money, as well as the various bank accounts between which investor funds were transferred before he ultimately used them to pay off his personal expenses. As the person who had made the representations to the investors, Harbour undoubtedly knew or was reckless in not knowing that the manner in which he used the investor funds was inconsistent with what he told the investors.

43. By engaging in the conduct described above, Harbour, with scienter, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

44. By engaging in the conduct described above, Harbour violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. §240.10b-5(b).

## SECOND CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a)(2) of the Securities Act

### (Against Harbour)

45. The SEC realleges and incorporates by reference paragraphs 1 through 39 above.

46. Harbour obtained money by means of material misrepresentations to the investors. As discussed above, based on Harbour's representations that their money would be used to finance various revenue-generating businesses, the four investors invested $2,450,000 in entities for which Harbour was the sole member and manager. Harbour, who had control over the entities' bank accounts, then misappropriated $1,535,000 of the investor funds for his personal expenses, thereby obtaining money by means of his misrepresentations to investors.

47. Harbour acted with scienter and was negligent. Harbour made the statements to the investors about how their money would be used and controlled the bank accounts from which their funds were misappropriated. Harbour therefore knew or was negligent in not knowing that his use of investor funds was contrary to what he had represented to the investors.

48. By engaging in the conduct described above, Harbour, directly or

indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly, obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

49. By engaging in the conduct described above, Harbour violated, and unless restrained and enjoined will continue to violate Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

**I.**

Issue findings of fact and conclusions of law that Harbour committed the alleged violations.

**II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Harbour, and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)], and Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

**III.**

Order Harbour to disgorge all funds received from his illegal conduct, together with prejudgment interest thereon.

**IV.**

Order Harbour to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**V.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

**VI.**

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: July 31, 2018

                                              s/ Amy J. Longo
                                   Amy J. Longo
                                   Attorney for Plaintiff
                                   Securities and Exchange Commission